# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JAIME RODRIGO ANTE LATACUNGA,**

    **Petitioner,**

    v.                                                     **No. 26-cv-00312 JB/JFR**

**GEORGE DEDOS, Warden of Cibola County
Correctional Center, and MARY DE ANDA-
YBARRA, Field Office Director of Enforcement
and Removal Operations, El Paso Field Office,
U.S. Immigration and Customs Enforcement,**

    **Respondents.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on the Amended Petition for Writ of Habeas Corpus

Under 28 U.S.C. § 2241 ("Petition"), filed by Petitioner Jaime Rodrigo Ante Latacunga

("Petitioner") on February 19, 2026.  Doc. 4.  Respondent Mary De Anda-Ybarra, United States

Immigration and Customs Enforcement ("ICE") El Paso Field Office Director, timely responded

on March 17, 2026.  Doc. 11; *accord* Doc. 7.  Respondent George Dedos, Warden of Cibola

County Correctional Center, has not filed an appearance and has not responded.  However,

Respondent Anda-Ybarra asserts that her arguments apply with equal force to Respondent

Dedos.[2]  Doc. 10 at 1 n.1.  Petitioner timely replied on March 21, 2026.  Doc. 13; *accord* Doc. 7.

---

[1] By an Order of Reference Relating to Immigration Habeas Corpus Proceedings filed March 3, 2026, the presiding judge, United States District Judge James O. Browning, referred this matter to the undersigned to conduct hearings as warranted and to perform any legal analysis required to recommend an ultimate disposition of the case.  Doc. 8; *accord* 28 U.S.C. §§ 636(b)(1)(B), (b)(3); *Va. Beach Fed. Sav. & Loan Ass'n v. Wood*, 901 F.2d 849 (10th Cir. 1990).

[2] Given the representation that the arguments of the respondents align, *see* Doc. 10 at 1 n.1, the Court will refer to both named respondents collectively as "Respondents" herein.

Having considered the briefing and the relevant law, the undersigned recommends that the Petition (Doc. 4) be **GRANTED** as to Counts I and III for violations of the Immigration and Nationality Act ("INA") and procedural due process. In light of the recommendation that Petitioner be immediately released from custody, the undersigned recommends that the Count II substantive due process claim be **DENIED AS MOOT**. Having resolved the Petition (Doc. 4), the undersigned lastly recommends that Petitioner's *Motion for Immediate Release Pending Resolution of Habeas Petition* (Doc. 12) be **DENIED AS MOOT**.

## TABLE OF CONTENTS

I.   RELEVANT FACTUAL BACKGROUND                                                            3

II.  RELEVANT PROCEDURAL BACKGROUND                                                         4

III. LEGAL STANDARDS                                                                        7
     A.  Writ of Habeas Corpus                                                              7
     B.  Fifth Amendment Due Process Clause                                                 8
         1.  Procedural Due Process                                                         8
             i.   Entry Fiction Doctrine                                                   10
         2.  Substantive Due Process                                                       13

IV. ANALYSIS                                                                               15
     A.  The Response is Sufficient Inasmuch as It Does Not Constitute Waiver              15
     B.  Petitioner is Not Properly Detained Under 8 U.S.C. § 1225(b)(2)                   15
         1.  Legal Background and Overview of Detention Under the INA                      16
         2.  Petitioner is an "Applicant for Admission" as Defined in 8 U.S.C. § 1225(a)  19
         3.  Being an "Applicant for Admission" is Distinct from "Seeking Admission"      20
             i.   Plain Text                                                               21
             ii.  Avoiding Superfluity/Surplusage                                          23
             iii. Regulatory History                                                       25
         4.  Seeking Asylum Differs from "Seeking Admission"                               25
     C.  Failure to Properly Rescind Petitioner's Parole Violates Procedural Due Process   29
     D.  Petitioner's Substantive Due Process Claim is Moot                                32
     E.  Attorney's Fees                                                                   33

V.   RECOMMENDATIONS                                                                       35

## I.   RELEVANT FACTUAL BACKGROUND

Petitioner, a national and citizen of Ecuador, is thirty-six years old.  Doc. 4 at 6 ¶ 22. Petitioner, alongside his wife and two minor children, arrived in the United States ("U.S.") through the U.S.-Mexico border in or around Lukeville, Arizona, on July 26, 2023, "and immediately presented himself to immigration authorities."  *Id.* at 1 ¶ 2.  Petitioner alleges that he expressed fear of returning to Ecuador, but that Customs and Border Protection ("CBP") officers did not refer Petitioner for a credible fear interview.  *Id.* at 2 ¶ 3 (citing 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30).

The following day (July 27, 2023), Petitioner and his family were released on their own recognizance under 8 U.S.C. § 1226(a)(2)(B).  Doc. 4 at 2 ¶ 4.  The Order of Release on Recognizance ("OREC") (Doc. 4-1) explicitly states that Petitioner's release was "in accordance with section 236 of the Immigration and Nationality Act [8 U.S.C. § 1226]" provided that he complies with conditions of release.  Doc. 4 at 2 ¶ 4 (alteration in original) (citing Doc. 4-1).  In addition to the OREC (Doc. 4-1), CBP officers served Petitioner a Notice to Appear ("NTA") (Doc. 4-2), commencing standard removal proceedings under 8 U.S.C. § 1229a.  Doc. 4 at 2 ¶ 5 (citing Doc. 4-2).  The NTA asserted a single charge of inadmissibility under 8 U.S.C. § 1182(a)(6)(A)(i) based on Petitioner's presence in the U.S. without having been admitted or paroled.  Doc. 4 at 2 ¶ 5.  Petitioner's first immigration hearing was set for July 26, 2024.  *Id.* at 8 ¶ 26 (citing Doc. 4-2).  On October 30, 2024, Petitioner defensively applied for asylum as relief from removal.  *Id.* (citing Doc. 4-3).

Prior to Petitioner's current detention, he lived in Columbia Heights, Minnesota, with his wife and two children (eight and twelve years old).  *Id.* at ¶ 27.  Petitioner "has no criminal record and has never been arrested or accused of any crimes."  *Id.*  Petitioner worked lawfully

and was employed as a handyman for a property management company.  *Id.*  Additionally,

Petitioner and his family were actively involved with the Emmanuel Covenant Church.  *Id.*

On July 8, 2025, ICE, "in coordination with" the Department of Justice ("DOJ"), issued

'Interim Guidance Regarding Detention Authority for Applicants for Admission' ("Interim

Guidance"), which declared that *all* noncitizens[3] who entered the U.S. without inspection are to

be deemed "applicants for admission" qualifying for mandatory detention under 8 U.S.C. §

1225(b)(2)(A).  Doc. 4 at 13 ¶ 48.  On September 5, 2025, in the precedential[4] decision *Matter of*

*Yajure Hurtado* (*Hurtado*), 29 I. & N. Dec. 216 (BIA 2025), the Board of Immigration Appeals

("BIA") adopted the position set forth in the Interim Guidance.  Doc. 4 at 13 ¶ 49.

On January 6, 2026, Petitioner was arrested in North Minneapolis during "Operation

Metro Surge."  *See* Doc. 4 at 2-3 ¶¶ 6-7.  No evidence indicates that Petitioner violated the

conditions of his parole or that Respondents took any action to revoke his parole.  *See id.* at 3 ¶¶

7-8.  Nevertheless, Respondents argue that Petitioner's detention is proper under 8 U.S.C. §

1225(b)(2)(A).  Doc. 11 at 2.  Petitioner was first detained in Saint Paul, Minnesota, Doc. 11-2 at

2, then transferred to El Paso, Texas, *id.*, and then transferred to Milan, New Mexico, where he

currently remains in custody at the Cibola County Correctional Center, *see* Doc. 4 at 3 ¶ 7.

## II.  <u>RELEVANT PROCEDURAL BACKGROUND</u>

Petitioner first filed suit on February 7, 2026.  Doc. 1.  On February 9, 2026, the Clerk of

the Court provided notice of the completion of electronic service, in accordance with the

---

[3] In line with Supreme Court practice, *see, e.g.*, *Barton v. Barr*, 590 U.S. 222, 226 n.2 (2020) (Kavanaugh, J., concurring), and recent preferred nomenclature, *see Avilez v. Garland*, 69 F.4th 525, 527 n.1 (9th Cir. 2023) (collecting cases), the Court uses the term "noncitizen(s)" in lieu of the term "alien" to refer to "any person who is not a citizen or national of the United States," *Pereira v. Sessions*, 585 U.S. 198, 201 n.1 (2018), except in quoted language.  The use of the alternative term "noncitizen" is not intended to imply a legal distinction.

[4] "Precedential" is a specific term in immigration law, which identifies decisions from the BIA which are binding authorities on the U.S. Immigration Court, not over this Court.

Standing Order, filed January 28, 2026, in 26-MC-00004-03.  Doc. 2.  Petitioner filed the present Petition on February 19, 2026.  Doc. 4.  Therein, Petitioner asserts three counts for relief.

Count I alleges violations of the INA and its implementing regulations, arguing multiple reasons that Petitioner's detention is improper under 8 U.S.C. § 1225(b)(2).  *See generally* Doc. 4 at 23-25 ¶¶ 75-82.  Specifically, Petitioner argues, *inter alia*, that: (1) "[t]he government's election to apply discretionary detention forecloses retroactive application of § 1225(b)(2)'s mandatory detention provision," Doc. 4 at 23-24 ¶ 76; (2) Petitioner does not meet the requirements of § 1225(b)(2)(A), Doc. 4 at 24 ¶ 77; (3) the initial failure to provide a credible fear interview places Petitioner outside the scope of § 1225(b), Doc. 4 at 24 ¶ 78; (4) Respondents failed to properly rescind Petitioner's conditional parole and issue a warrant for his arrest and re-detention, *id.* at ¶ 79 (citing 8 C.F.R. §§ 1236.1(c)(9), 1357(a)(2)); and thus (5) Respondents lacked "statutory authority to arrest [Petitioner] from the outset," *id.* at 25 ¶ 82.

Count II raises a substantive due process claim under the Fifth Amendment Due Process Clause.  *See generally id.* at 25 ¶¶ 83-87.  Petitioner argues that "Respondents' [warrantless arrest and] decision to re-detain Petitioner under § 1225(b)(2) after electing to process him under § 1226(a) constitutes 'deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice.'"  Doc. 4 at 25 ¶ 85 (quoting *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013)).  Petitioner further contends that "Respondents' warrantless arrest and re-detention of Petitioner serve no rational purpose," and that such conduct is "excessive in relation to facilitating deportation, preventing danger to the community and flight risk."  *Id.* at ¶ 86.  For those reasons, Petitioner argues that "[t]he deprivation of [his] liberty . . .  is punitive, not regulatory, [and] violating [his] substantive due process rights under the Fifth Amendment."  *Id.* at ¶ 87.

5

Lastly, Count III raises a procedural due process claim under the Fifth Amendment Due Process Clause. *See generally id.* at 26 ¶¶ 88-94. Petitioner argues that he acquired a "substantial liberty interest" by virtue of living in the U.S. for more than two years, and therefore he "has a fundamental interest in liberty and being free from official restraint." *Id.* at ¶ 89. In addressing why Petitioner believes that his case meets the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), Petitioner explains that "[t]he government's position lacks support in the plain text of the INA and contravenes longstanding interpretation and prevailing case law." Doc. 4 at 26 ¶ 91. Instead, Petitioner purports that the proper procedure requires "a bond redetermination hearing *prior to his re-detention*, as to whether he is a flight risk or danger to others . . . ." *Id.* at ¶ 92 (emphasis in original).

For remedies, Petitioner requests that the Court (lettered in the same order as the Petition's Prayer for Relief): (a) assume jurisdiction; (b) enjoin his transfer outside the district while this case is pending; (c) issue an order to show cause why the Petition should not be immediately granted; (d) issue a writ requiring his immediate release; (e) declare that his detention under 8 U.S.C. § 1225(b)(2)(A) is unlawful and violates the INA and/or Due Process Clause of the Fifth Amendment; (f) alternatively, order Respondents to provide Petitioner a custody redetermination hearing where the government must carry the evidentiary burden; (g) enjoin and restrain Respondents from re-detaining Petitioner unless the government demonstrates by clear and convincing evidence at a pre-deprivation bond hearing before a neutral decisionmaker that Petitioner is a flight risk or danger to the community; (h) order Respondents to file a Notice of Compliance within seven days of the Court's order; and (i) award attorney's fees and costs. Doc. 4 at 27-28.

On March 3, 2026, the Court issued an Order to Answer, requiring Respondents to respond within ten business days (i.e., on or before March 17, 2026), and allowing Petitioner to file his Reply, if any, five business days after Respondents' Response.  Doc. 7 at 2.  On March 17, 2026, Respondents timely filed a Consolidated Response to Petitions for Writ of Habeas Corpus ("Response").  Doc. 11.  Petitioner timely replied on March 21, 2026.  Doc. 13.

On March 20, 2026, Petitioner filed a *Motion for Immediate Release Pending Resolution of Habeas Petition*.  Doc. 12.  Respondents failed to timely respond, so on April 6, 2026, Petitioner filed Notice of Respondents' Failure to Respond and Request for Ruling on Motion. Doc. 14.

### III. LEGAL STANDARDS

#### A.  Writ of Habeas Corpus

The All Writs Act, as the name implies, provides federal courts with general authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions . . . ."  28 U.S.C. § 1651(a).  Available writs include, *inter alia*, mandamus, habeas corpus, certiorari, quo warranto, and prohibition—antiquatedly termed "prerogative writs."  *See generally Withrow v. Williams*, 507 U.S. 680, 716 (1993) (Scalia & Thomas, JJ., concurring in part) ("In English law, habeas corpus was one of the so-called 'prerogative' writs, which included the writs of mandamus, certiorari, and prohibition." (citations omitted)).

Additionally, 28 U.S.C. § 2241(a) provides federal courts the jurisdiction to grant a writ of habeas corpus to "release from unlawful physical confinement," *Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973), a petitioner demonstrating "by a preponderance of the evidence," *Beeler v. Crouse*, 332 F.2d 783, 783 (10th Cir. 1964) (per curiam), the existence of one of the five circumstances enumerated in 28 U.S.C. § 2241(c).  Relevant here, a petition for a writ of habeas

corpus raised pursuant to 28 U.S.C. § 2241(c)(3) seeks release from federal custody that is "in violation of the Constitution or laws or treaties of the United States . . . ."

The Constitution guarantees that the writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. CONST. art. I, § 9, cl. 2). This includes immigration-related detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *Rasul v. Bush*, 542 U.S. 466, 483-84 (2004) ("[Noncitizen] Petitioners contend that they are being held in federal custody in violation of the laws of the United States. . . . Section 2241, by its terms, requires nothing more."), *judgment entered*, No. 04A41, 2004 WL 7372970 (U.S. July 16, 2004).

## B. **Fifth Amendment Due Process Clause**

The Fifth Amendment to the United States Constitution states that the government shall not deprive any person "of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. V, § 1. The Due Process Clause encompasses two distinct forms of protection: (1) procedural due process, which requires the government to employ fair procedures when depriving a person of a protected interest; and (2) substantive due process, which guarantees that the government cannot deprive a person of a protected interest for certain reasons. *See Reid v. Pautler*, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014) (Browning, J.) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." *Chavez-Rodriguez v. City of Santa Fe*, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008) (Browning, J.).

### 1. **Procedural Due Process**

The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (1) "[d]id the individual possess a protected

8

property [or liberty] interest to which due process protection was applicable?"; and (2) "[w]as the individual afforded an appropriate level of process?" *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1219 (10th Cir. 2006) (quoting *Clark v. City of Draper*, 168 F.3d 1185, 1189 (10th Cir. 1999)). "[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms," that are amongst the great constitutional concepts purposefully left to gather meaning from experience. *Id.* at 571 (quoting *Nat'l Mut. Ins. v. Tidewater Transfer Co.*, 337 U.S. 582, 646 (1949) (Frankfurter, J., dissenting)).

Relevant here, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is 'created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract.'" *Teigen v. Renfrow*, 511 F.3d 1072, 1079 (10th Cir. 2007) (quoting *Carnes v. Parker*, 922 F.2d 1506, 1509 (10th Cir. 1991)); *accord Paul v. Davis*, 424 U.S. 693, 710 (1976) ("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").

"In short, once it is determined that the Due Process Clause applies, 'the question remains what process is due.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Id.* at 542 (quoting *Mullane v. Cent. Hanover Bank & Tr.*

*Co.*, 339 U.S. 306, 313 (1950)).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews*, 424 U.S. at 334 (quoting *Morrissey*, 408 U.S. at 321) (quotation marks omitted).  The Supreme Court explains that:

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate.  We have pointed out that the formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

*Cleveland Bd. of Educ.*, 470 U.S. at 542, 545 (emphasis in original) (cleaned up).

The required hearing depends on: (1) the private interest at stake; (2) the risk of erroneous deprivation given the procedures that the government already guarantees and whether additional procedural safeguards prove valuable; and (3) the government's interest and the burdens that additional procedures might impose.  *See Mathews*, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." *Clark*, 168 F.3d at 1189; *see, e.g.*, *Spielman v. Hildebrand*, 873 F.2d 1377, 1385 (10th Cir. 1989) (concluding that removal of a child from parents' custody requires pre-deprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." (quoting *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 848 (1977))).

### i.   <u>Entry Fiction Doctrine</u>

Against the general rule that due process applies to all persons, *see Zadvydas*, 533 U.S. at 693, there exists an exception known as "entry fiction."  *See generally Singh v. Noem*, No. CIV 25-1110, 2026 WL 146005, at *27-32 (D.N.M. Jan. 20, 2026) (Browning, J.) (expounding the

10

entry fiction doctrine and due process in the context of immigration law).  In essence, the entry fiction doctrine distinguishes between noncitizens who have "effected an entry" and those, irrespective of their physical presence, who remain "on the threshold of initial entry."

The entry fiction doctrine is rooted in the longstanding "sovereign prerogative," *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (first citing *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); and then citing *Nishimura Ekiu v. United States*, 142 U.S. 651, 659-60 (1892)), regarding "any policy toward aliens," *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952).  *See also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (stating the sovereign's prerogative is a "fundamental proposition").  "Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."  *Harisiades,* 342 U.S. at 589.

Consequently, this sovereign prerogative includes the political branches' plenary power to admit or exclude noncitizens.  *See id.*  However, once a noncitizen enters the U.S., the plenary power to admit or exclude noncitizens is no longer plenary, *see Landon*, 459 U.S. at 32 ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."), because the Due Process Clause applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent," *Zadvydas*, 533 U.S. at 693.  Accordingly, whether an alien is "within" the U.S. is a determination with constitutional significance.  *See Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) (recognizing "additional rights and privileges" for noncitizen "within the United States after an entry, irrespective of its legality.").

Immigration law balances the sovereign prerogative to admit or exclude with the constraints the Due Process Clause imposes by distinguishing between noncitizens who are "on

11

the threshold of initial entry," *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953), and those who gain a "foothold" (that is, effect an entry) in the U.S., *see Kaplan v. Tod*, 267 U.S. 228, 230 (1925).  Congress legislates against this settled constitutional background. *See, e.g.*, *Knauff*, 338 U.S. at 544; *Thuraissigiam*, 591 U.S. at 139.

A noncitizen's *continued* physical presence in the U.S., *see Thuraissigiam*, 591 U.S. at 139-40 (discussing how merely "set[ting] foot on U.S. soil" is insufficient to effect an entry), functions as a proxy for ties to the country that are sufficient to confer constitutional protections that a noncitizen who has not "made an entry" may not claim.  *See, e.g.*, *Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903) (distinguishing noncitizens entitled to due process from those "who ha[ve] been here for too brief a period to have become, in any real sense, a part of our population . . . .").  This presumption encompasses aliens who cross the border illegally without ever encountering law enforcement.  *See id.* at 101.

By contrast, noncitizens who are permitted to remain in the U.S. pending the government's decision whether to admit, remain "on the threshold of initial entry," and therefore are not entitled to the full range of constitutional protections afforded to those who have effected an entry, irrespective of the length of the noncitizen's physical presence.  *See, e.g.*, *Kaplan*, 267 U.S. at 230 (holding that noncitizen paroled to relatives' custody for over a decade was "still in theory of law at the boundary line and had gained no foothold in the [U.S.]."); *Leng May Ma*, 357 U.S. at 190 (explaining that excluded noncitizen is not entitled to the benefits of a deportation hearing because parole does not alter her status or otherwise bring her "within" the U.S.).  Put differently, such noncitizens exist in a state of legal and physical split; they are physically present in the U.S. yet legally confined to the border.  As a result, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is

12

concerned." *Knauff*, 338 U.S. at 544. However, noncitizens subject to the entry fiction doctrine are not deprived of all constitutional protections. Whether the entry fiction also limits a physically present noncitizen's substantive due process protections is a question the Supreme Court has repeatedly declined to resolve. *See, e.g.*, *Zadvydas*, 533 U.S. at 694 (declining to revisit *Mezei* and instead resolving the case on statutory grounds); *Clark v. Martinez*, 543 U.S. 371, 378-79 (2005) (extending the same implicit statutory limitation to inadmissible aliens without reaching the constitutional question).

### 2. **Substantive Due Process**

There are two substantive due process claims: (1) where the plaintiff alleges that the government infringes upon a fundamental right, *see Washington v. Glucksberg*, 521 U.S. 702, 721-22 (1997); and (2) where the plaintiff alleges that a government action deprives arbitrarily the plaintiff of life, liberty, or property, in a manner that shocks the judicial conscience, *see Rochin v. California*, 342 U.S. 165, 172 (1952). The Tenth Circuit "appl[ies] the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action." *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018).

The fundamental rights approach proceeds in three steps. *See Abdi v. Wray*, 942 F.3d 1019, 1028 (10th Cir. 2019). First, the Court must evaluate whether a fundamental right is at issue either: (A) "because the Supreme Court or the Tenth Circuit has already determined that it exists"; or (B) "because the right claimed to have been infringed by the government is one that is objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' such that it is 'fundamental.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 720-21). Second, the Court determines whether the right at issue "has been infringed through

either total prohibition or 'direct[ ] and substantial[ ]' interference." *Id.* (alteration in original) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978)). Third, if the right is fundamental, the Court must determine whether the government action at issue satisfies strict scrutiny. *See id.* (citing *Zablocki*, 434 U.S. at 388). If the right is not fundamental, however, the Court applies rational basis review. *See Reno v. Flores*, 507 U.S. 292, 305 (1993) (explaining that strict scrutiny is required "only when fundamental rights are involved.").

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." *Pena v. Greffet*, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013) (Browning, J.), *aff'd*, 511 F. App'x 742 (10th Cir. 2013) (unpublished). "Conduct that shocks the judicial conscience . . . is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'" *Seegmiller v. LaVerkin City*, 528 F.3d 762, 768 (10th Cir. 2008) (quoting *Lewis*, 523 U.S. at 846). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or 'employ[ed] it as an instrument of oppression.'" *Hernandez*, 734 F.3d at 1261 (alteration in original) (quoting *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008)). "The behavior complained of must be egregious and outrageous." *Id.*; *see also Cnty. of Sacramento*, 523 U.S. at 847 (stating that *Rochin* set the "benchmark" of executive abuse of power at "conduct 'that shocks the conscience' and violates the 'decencies of civilized conduct.'" (quoting *Rochin*, 342 U.S. at 172-173)).

14

## IV. ANALYSIS

### A. The Response is Sufficient Inasmuch as It Does Not Constitute Waiver

Before turning to the merits, the Court briefly addresses Petitioner's threshold argument that "Respondents fail to engage with the specific facts and legal arguments that Petitioner raised in his Amended Petition for Writ of Habeas Corpus (Doc. 4)," and therefore, "it is appropriate to consider those issues as waived." Doc. 13 at 1.

A response to a writ of habeas corpus "shall . . . certify[ ] the true cause of the detention." 28 U.S.C. § 2243. Here, the Response turns on the theory that Petitioner is properly detained under 8 U.S.C. § 1225(b)(2). *See generally* Doc. 11. Respondents thus contend that "no pre-deprivation hearing was required, because mandatory detention under § 1225(b)(2) is constitutionally permissible and Petitioner is appropriately classified under that section." Doc. 11 at 18.

The Court finds the Response sufficient (to the extent that it does not constitute waive) because if Respondents' theory is correct, then Petitioner's arguments that the government failed to revoke his conditional parole under the proper regulatory procedures become moot. *See id.* Moreover, to the extent that Petitioner argues that the Response failed to address Petitioner's arguments that his warrantless arrest lacked statutory authority, *see* Doc. 14 at 5, as Respondents correctly point out, even if Petitioner's arrest were unlawful in and of itself, that is not the basis for his present detention nor is it a basis for habeas relief, Doc. 11 at 16-17 & n.5 (collecting cases).

### B. Petitioner is Not Properly Detained Under 8 U.S.C. § 1225(b)(2)

8 U.S.C. § 1225 and 8 U.S.C. § 1226 are not mutually exclusive; the statutes have overlapping scopes. *See Singh*, 2026 WL 146005, at \*16 (Browning, J.). Section 1226 is a

15

general provision that covers "alien[s]."  8 U.S.C. § 1226(a).  This includes both noncitizens who have been lawfully admitted (such as those with visas or lawful permanent residence) and noncitizens in the country illegally.  Section 1225(b)(2), by contrast, is a specific provision that covers the subset of noncitizens deemed "applicant[s] for admission."  8 U.S.C. § 1225(a).  As described above, these are noncitizens "present in the United States who ha[ve] not been admitted or who arrive in the United States."  *Id.*  Because all "applicant[s] for admission," *see* 8 U.S.C. § 1225(a), are "alien[s]," *see* 8 U.S.C. § 1226, the statutes necessarily overlap.

Therefore, the Court must first address whether Petitioner's detention can be governed under 8 U.S.C. § 1225(b).  No party argues that Petitioner is properly detained under 8 U.S.C. § 1225(b)(1).  *See generally* Docs. 4, 11, 13.  Therefore, the Court only analyzes 8 U.S.C. § 1225(b)(2), the statute that Respondents argue governs Petitioner's detention.  Doc. 11 at 1.  As set forth below, the Court concludes that Petitioner does not meet the requirements to be detained under 8 U.S.C. § 1225(b)(2)(A) because although he is an "applicant for admission" as defined by 8 U.S.C. § 1225(a)(1), his application for asylum does not constitute "seeking admission," a requirement which the Court concludes that Congress intended to differentiate from merely being an "applicant for admission."

### 1.  Legal Background and Overview of Detention Under the INA

The INA, as codified in various sections of Title 8 of the U.S. Code and supplemented by various subsections of Title 8 of the Code of Federal Regulations, authorizes three basic forms of detention for noncitizens in removal proceedings.  "The[se] applicable 'statutes apply at different stages of an alien's detention.'"  *Cruz-Zavala v. Barr*, 445 F. Supp. 3d 571, 575 (N.D. Cal. 2020) (quoting *Diouf v. Mukasey*, 542 F.3d 1222, 1228 (9th Cir. 2008)).  "Moreover, '[w]here an alien falls within this statutory scheme can affect whether his detention is mandatory or discretionary,

as well as the kind of review process available to him if he wishes to contest the necessity of his detention.'" *Id.* (alteration in original) (quoting *Prieto-Romero v. Clark*, 534 F.3d 1053, 1057 (9th Cir. 2008)).

First, 8 U.S.C. § 1225 (INA § 235) mandates the detention of two classes of noncitizens. Subsection (b)(1) mandates the detention of arriving noncitizens and "certain other aliens" defined in (b)(1)(A)(iii), through the conclusion of expedited removal proceedings.  Subsection (b)(2) is a "catchall provision," *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018), that mandates the detention of "applicants for admission" as defined in subsection (a)(1), who are "seeking admission" and "not clearly and beyond a doubt entitled to be admitted," through the conclusion of "the usual removal process" under 8 U.S.C. § 1229a, *Thuraissigiam*, 591 U.S. at 108.  Second, 8 U.S.C. § 1226 (INA § 236) allows, under subsection (a), the discretionary release of noncitizens arrested and detained pursuant to a warrant issued by the Secretary of Homeland Security,[5] except for noncitizens deemed inadmissible or deportable for specific criminal activity and/or offenses listed under subsection (c).  Third, and lastly, 8 U.S.C. § 1231 (INA § 241) mandates the detention of noncitizens with a final order of removal under subsection (a)(2), but subsection (a)(3) requires the supervised release of noncitizens (except noncitizens deemed inadmissible or deportable for specific criminal activity and/or offenses listed in (a)(2)(A)) who do not leave or are removed within the removal period as measured under subsection (a)(1).

These detention provisions were enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") of 1996.  Pub. L. No. 104-208, 110 Stat. 3009.  By way of comparison, before Congress enacted IIRIRA, the INA provided for two types of removal

---

[5] Although 8 U.S.C. § 1226 (a) indicates that the "Attorney General" is responsible for the detention of noncitizens, the Homeland Security Act of 2002 transferred this authority to the Secretary of Homeland Security.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296 § 441(2), 116 Stat. 2135, 2192 (2002) (codified at 6 U.S.C. §§ 251, 291).

proceedings: deportation hearings and exclusion hearings.  *See Hose v. Immigr. & Naturalization Serv.*, 180 F.3d 992, 994 (9th Cir. 1999).  As the BIA more recently summarized:

> Aliens who were ""[sic] seeking admission" at a port of entry under former section 235 of the INA, 8 U.S.C. § 1225, or who had been paroled into the United States and were determined to be excludable were placed in exclusion proceedings and subject to mandatory detention, with potential release solely by means of a grant of parole under section § [sic] 212(d)(5), 8 U.S.C. § 1182(d)(5) (1994).

*Hurtado*, 29 I. & N. Dec. at 223.

When Congress enacted IIRIRA, the Executive Office for Immigration Review clarified in its implementing regulations that, as a general matter, individuals who entered the U.S. without inspection were not to be detained under 8 U.S.C. § 1225(b), but rather 8 U.S.C. § 1226(a).  Doc. 4 at 12 ¶ 46 (citing Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) [hereinafter IIRIRA Implementation] ("Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination.")).

On July 8, 2025, ICE, "in coordination with" DOJ, issued the Interim Guidance declaring that all noncitizens who entered the U.S. without inspection are to be deemed "applicants for admission" qualifying for mandatory detention under 8 U.S.C. § 1225(b)(2)(A).  Doc. 4 at 13 ¶ 48.  On September 5, 2025, the BIA adopted this conclusion in *Hurtado*, 29 I. & N. Dec. at 229.  Doc. 4 at 13 ¶ 49.  There, the BIA held that all noncitizens who entered the U.S. without admission or parole are subject to detention under § 1225(b)(2)(A) and are ineligible for bond hearings.  *Hurtado*, 29 I. & N. Dec. at 229.  As such, the BIA further concluded that IJs lack authority to consider bond requests or grant bond to noncitizens present in the U.S. without admission.  *Id.*  While the parties do not argue futility, *see generally* Docs. 4, 11, 13, as a matter

18

of completeness, it is worth noting that the conclusions set forth in *Hurtado* render any attempt to seek relief directly from the agency futile. *See Romero v. Hyde*, 795 F. Supp. 3d 271, 278-281 (D. Mass. 2025); *Mosqueda v. Noem*, No. 25-cv-02304, 2025 WL 2591530, at *7 (C.D. Cal. Sep. 8, 2025) (explaining that until the "BIA no longer applies a policy that likely violates federal law, the circumstances do not present a need for requiring prudential exhaustion.").

### 2. Petitioner is an "Applicant for Admission" as Defined in 8 U.S.C. § 1225(a)

The Court begins with a plain text review. *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.' Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." (alteration in original) (citations omitted)). Section 1225(a)(1) defines an "applicant for admission" to include two categories of noncitizens: (1) "[a]n alien present in the United States who has not been admitted"; and (2) "[a]n alien . . . who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) . . . ." 8 U.S.C. § 1225(a)(1).

Based on the plain text of that provision, Petitioner is an applicant for admission as defined under 8 U.S.C. § 1225(a)(1) because he is an "alien present in the United States who has not been admitted . . . ." *Accord Jennings*, 583 U.S. at 287 ("[A]n alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.' Applicants for admission must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law."); IIRIRA Implementation, 62 Fed. Reg. at 10323 (explaining that "aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection)"

19

are considered applicants for admission but nevertheless "eligible for bond and bond redetermination.").

### 3. Being an "Applicant for Admission" is Distinct from "Seeking Admission"

After 8 U.S.C. § 1225 defines an "applicant for admission," in subsection (a), subsection (b) then discusses, pursuant to its title, the "[i]nspection of applicants for admission." 8 U.S.C. § 1225(b). Subsection (b) largely divides the inspection and detention of certain "applicants for admission" into two further subsections. First, subsection (b)(1) pertains to arriving noncitizens and "certain other aliens who have not been admitted or paroled." 8 U.S.C. § 1225(b)(1). It also applies "to certain other aliens designated by the [Secretary of Homeland Security] in his discretion." *Jennings*, 583 U.S. at 287 (citing 8 U.S.C. § 1225(b)(1)(A)(iii)). No party has argued that § 1225(b)(1) is relevant here.[6] Second, subsection (b)(2) "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here)." *Jennings*, 583 U.S. at 287 (citing 8 U.S.C. §§ 1225(b)(2)(A), (B)).[7] Although subsection "(b)(2) is broader," *id.*, Congress specified its application to noncitizens who are "an applicant for admission . . . seeking admission [who] is not clearly and beyond a doubt entitled to be admitted," 8 U.S.C. § 1225(b)(2)(A).

The question, then, is *how* broad is the "catchall" application of § 1225(b)(2)? That question is the root of this case, amongst thousands of other cases pending and adjudicated across the country. *See Romero*, 795 F. Supp. 3d at 273 (collecting cases); *Chen v. Soto*, No. 25-17198, 2025 WL 3527239, at *2 n.4 (D.N.J. Dec. 9, 2025) (same). The Court finds that

---

[6] Instead, the parties' arguments focus on the applicability of 8 U.S.C. § 1225(b)(2). Nevertheless, it is helpful to understand the relationship between the two, given the subsection at issue is "broader." *Jennings*, 583 U.S. at 287.

[7] "Congress is mindful, however, to distinguish this group of "other aliens" in § 1225(b)(2) from the "certain other aliens" in § 1225(b)(1)(A)(iii)." *Singh*, 2026 WL 146005, at *18 (Browning, J.).

Congress intended to differentiate an "applicant for admission," from a noncitizen "seeking admission."  *See Singh*, 2026 WL 146005, at \*20 (Browning, J.).

The Court is well aware that two circuits, in 2-1 decisions, have concluded the opposite. After the completion of briefing in this case, the Eighth Circuit agreed with the Fifth Circuit's reasoning in *Buenrostro-Mendez* that the phrase "applicant for admission" and "seeking admission" mean the same.  *Avila v. Bondi*, ---- F.4th ----, No. 25-3248, 2026 WL 819258, at \*3 (8th Cir. Mar. 25, 2026) (quoting *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 504 (5th Cir. 2026)).  Both circuits held that a noncitizen who entered the U.S. many years ago without inspection and lacking legal documents authorizing his admission may be detained without bond under § 1225(b)(2)(A).  *See Avila*, 2026 WL 819258, at \*3; *Buenrostro-Mendez*, 166 F.4th at 498-500.  Neither *Avila* nor *Buenrostro-Mendez* is binding on this Court, however, and this Court declines to follow their reasoning.  Moreover, as of date, there is no controlling law from the Tenth Circuit on this issue.

### i.  **Plain Text**

The Court again begins with a plain text review.  As it must, the Court presumes that Congress "says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Likewise, "'every clause and word of a statute' should have meaning . . . ."  *U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)).

8 U.S.C. § 1225(b)(2)(A) reads as follows:

> Subject to subparagraphs (B) and (C), in *the case of* an alien who is an applicant for admission, *if* the examining immigration officer determines that *an alien seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

(emphasis added).  The Court construes this to set forth three requirements to be met for §

1225(b)(2) to apply: (1) the alien is an "applicant for admission," as defined in § 1225(a); (2) the

alien is "seeking admission"; and (3) the examining immigration officer determines that the alien

is not clearly and beyond doubt entitled to be admitted.  *See* 8 U.S.C. § 1225(b)(2)(A).

To break it down, Congress first contextualizes the application of § 1225(b) to

"applicant[s] for admission," generally.  *See* 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien

who is an applicant for admission . . . .").  Congress, then uses the conditional term "if," to

further narrow the application.  *See id.*  The condition of that narrowed scope is that "the

examining immigration officer" makes a determination.  *See id.* ("[I]n the case of . . ., *if* the

examining immigration officer determines that . . . .").  The determination that the examining

immigration officer must make is whether "*an alien seeking admission* is not clearly and beyond

a doubt entitled to be admitted . . . ."  *See id.*  This determination is not to be answered with

respect to "alien[s] seeking admission," generally, but only in the context of "applicants for

admission."  *See id.*  Without becoming distracted by what it means to "seek[ ] admission," the

language demonstrates that Congress intended some form of a distinction.  *See* 8 U.S.C. §

1225(b)(2)(A).  Just as courts "have no right" to presume distinctions exist when a statute is

silent, *Northwestern Nat. Life Ins. v. Riggs*, 203 U.S. 243, 252 (1906), it follows, then, that courts

have no right to presume a distinction does not exist where Congress includes language

indicating a designation.  *Cf. Pillsbury v. United Eng'g Co.*, 342 U.S. 197, 199 (1952) ("We are

not free, under the guise of construction, to amend the statute by inserting therein before the

word 'injury' the word 'compensable' so as to make 'injury' read as if it were 'disability.'

Congress knew the difference between 'disability' and 'injury' and used the words advisedly.").

While Congress could have drawn (and defined) such a distinction with greater clarity, courts are charged with interpreting statutes, not (re)writing them. *See id.* In pursuit of its proper role, the Court must follow the interpretive principle that "every clause and word of a statute" has meaning. *Montclair*, 107 U.S. at 152. If Congress intended for § 1225(b)(2) to apply to all other "applicants for admission" not otherwise detained pursuant to § 1225(b)(1), it could have done so. *Cf. Buenrostro-Mendez*, 166 F.4th at 504 ("[I]f Congress had intended an alien 'seeking admission' to effectively mean 'arriving alien,' it would simply have said 'arriving alien.' Congress did not hesitate to use the 'arriving alien' language elsewhere in § 1225." (citing 8 U.S.C. §§ 1225(a)(2), (c)(1), (d)(2))). But that is not the present case. Instead, Congress chose a lengthier statute, and each word "should have meaning . . . ." *Polansky*, 599 U.S. at 432. In further support, "Congress uses the phrase 'seeking admission' only sparingly in § 1225 and always with precision." *Singh*, 2026 WL 146005, at *20 (Browning, J.).

In conclusion, Respondents' construction creates impermissible surplusage by overlooking any potential meaning behind the additional language included by presuming that the passive statutory designation of being an "applicant for admission" automatically equates the affirmative action of "seeking admission."

### ii.  Avoiding Superfluity/Surplusage

In further support, concluding otherwise would impermissibly render multiple subsections of 8 U.S.C. § 1226(c) superfluous. *See Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1061-62 (7th Cir. 2025); *accord Bilski v. Kappos*, 130 S. Ct. 3218, 3222 (2010) ("A contrary conclusion would violate the canon against interpreting any statutory provision in a manner that would render another provision superfluous."); *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an

23

interpretation would render superfluous another part of the same statutory scheme."). In brief, 8 U.S.C. § 1226(c) sets forth certain inadmissible or deportable noncitizens who are ineligible to be released on bond under § 1226(a), due to certain criminal offenses, and thus subject to mandatory custody. *See* 8 U.S.C. § 1226(c)(1)(A)-(E). Of these subsections, only §§ 1226(c)(1)(A), (D), and (E) discuss the mandatory detention of noncitizens deemed inadmissible under various subsections of 8 U.S.C. § 1182(a).[8] Although Petitioner is not subject to mandatory detention under § 1226(c), this subsection's multiple references to noncitizens who must remain detained due to certain causes for inadmissibility makes evident that § 1226(a) may apply, *inter alia*, to noncitizens apprehended in the interior who were never inspected upon their entry. *See, e.g.*, 8 U.S.C. 1226(c)(1)(A), (D), (E)(i).

Moreover, § 1226(a) cannot be read as an "exception" to § 1225(b)(2). Although § 1225(b)(2) does not define the length of such detention, the Supreme Court held in *Jennings* that § 1225(b)(2) reads "most naturally" as *mandating* detention *through* the *conclusion* of removal proceedings. 583 U.S. at 297 ("Read most naturally, §§ 1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded."). Although the Supreme Court recognized that § 1225(b) fails to "say[ ] anything about bond hearings," the Supreme Court nevertheless held that outside of the one "express exception" codified in 8 U.S.C.

---

[8] First, 8 U.S.C. § 1226(c)(1)(A) mandates detention of any noncitizen who "is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title," which generally discusses conviction for crimes of moral turpitude or regarding controlled substances. *See generally* 8 U.S.C. § 1182(a)(2). Second, 8 U.S.C. § 1226(c)(1)(D) mandates detention of any noncitizen who "is inadmissible under section 1182(a)(3)(B) of this title," which discusses terrorist activities. *See generally* 8 U.S.C. § 1182(a)(3)(B). Lastly, 8 U.S.C. § 1226(c)(1)(E) mandates the detention of any noncitizen who: "(i) is inadmissible under paragraph (6)(A), (6)(C), or (7) of section 1182(a) of this title"; (which respectively discuss noncitizens present without admission or parole, noncitizens who willfully misrepresent a material fact to seek or obtain immigration benefits (e.g., paperwork, admission) under Chapter 12, *see generally* 8 U.S.C. §§ 1182(a)(6)(A), (a)(6)(C), (a)(7)) and "(ii) is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person," 8 U.S.C. § 1226(c)(1)(E)(i)-(ii), as defined "in the jurisdiction in which the acts occurred," 8 U.S.C. § 1226(c)(2).

§ 1182(d)(5)(A) (allowing temporary parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit"), "there are *no other* circumstances under which aliens detained under § 1225(b) may be released." *Jennings*, 583 U.S. at 300 (emphasis added).

### iii. Regulatory History

Lastly, the Court recognizes that in *Leng May Ma*, the Supreme Court found it "important to note" that:

> our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality.  In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'

357 U.S. at 187 (quoting *Mezei*, 345 U.S. at 212).  Such a distinction was continued as a matter of administrative interpretation, as evidenced in the 1997 implementing regulation, which stated that "[d]espite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination."  IIRIRA Implementation, 62 Fed. Reg. at 10323.

To conclude, the plain text of § 1225(b)(2) does not inherently indicate that it applies to *all* "applicants for admission" as defined by 1225(a).  *See* 8 U.S.C. § 1225(b)(2)(A).  Rather, the plain text indicates that 8 U.S.C. § 1225(b)(2)(A) mandates detention for "applicants for admission" (as defined in § 1225(a)), who are not otherwise detained under 1225(b)(1), *and* are "seeking admission."  *See* 8 U.S.C. § 1225(b)(2)(A).

### 4. Seeking Asylum Differs from "Seeking Admission"

Having found that § 1225(b)(2)(A) applies to "applicants for admission," who are also "seeking admission," the next question, naturally, is: what does "seeking admission" *mean*?  8 U.S.C. § 1225 does not define "admission" or "admitted," but 8 U.S.C. § 1101(a)(13) defines

25

those terms to mean "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." This definition does not resolve the present issue, which is whether Petitioner's asylum application constitutes seeking admission.

Up until this point, the undersigned's conclusions have aligned with those reached in *Singh*, with respect to finding that the Petitioner is an "applicant for admission" as defined by 8 U.S.C. § 1225(a) and that being an "applicant for admission" is distinct from "seeking admission," as required by § 1225(b)(2)(A). *See* 2026 WL 146005, at *35 (Browning, J.); *see also Hernandez-Cruz v. Anda-Ybarra*, No. 26-cv-00486, 2026 WL 800687, at *5-6 (D.N.M. Mar. 23, 2026) (outlining Judge Browning's framework); *Galvan Lopez v. Noem*, No. 25-cv-1288, 2026 WL 252513, at *3-4 (D.N.M. Jan. 30, 2026) (same).

However, the undersigned concludes that seeking asylum differs from seeking admission, which differs from the conclusion in *Singh*. *Singh* held that a pending asylum application equates to "seeking admission" warranting mandatory detention under § 1225(b)(2)(A). 2026 WL 146005, at *35-36 (Browning, J.). As explained in *Singh*: "An alien may seek lawful entry at a port of entry, but an alien may also seek lawful admission from within the United States through statutory mechanisms such as an application for adjustment of status on Form I-485 or other congressionally authorized procedures for obtaining lawful admission." *Id.* at *21. *Singh* further reasoned that a noncitizen could seek admission at the border or "in the interior of the United States … when an alien who has not been admitted, an applicant for admission, makes some attempt to gain lawful admission, such as filing for an asylum or a visa." *Id.* at *35.

In contrast to *Singh*, the Supreme Court has clarified that lawful status and admission "are distinct concepts in immigration law." *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). An

adjustment of status under 8 U.S.C. § 1255 is a way for a nonimmigrant—a noncitizen lawfully

present in the country on a designated, temporary basis—to obtain lawful permanent resident

("LPR") status generally so long as the nonimmigrant's presence is pursuant to a lawful

admission.  *See Sanchez*, 593 U.S. at 411-12.  In *Sanchez*, the noncitizen entered unlawfully, and

after approximately 14 years, he applied for Temporary Protected Status ("TPS"), entitling him

to stay and work in the U.S. for as long as unsafe living conditions existed in his home country.

*See id.* at 411-13.  He applied for an adjustment to LPR status, which the USCIS denied because

he had not been lawfully admitted to the U.S.  *Id.* at 413.  The Supreme Court agreed because,

although the TPS program gives foreign nationals nonimmigrant status, it does not admit them.

*Id.* at 414.  As relevant here, the Supreme Court explained:

> On the one hand, a foreign national can be *admitted but not in lawful status*—think of someone who legally entered the United States on a student visa, but stayed in the country long past graduation.  On the other hand, a foreign national can be in lawful status but not admitted—*think of someone who entered the country unlawfully, but then received asylum*.  The latter is the situation Sanchez is in, except that he received a different kind of lawful status.  The TPS statute permits him to remain in the country; and it deems him in nonimmigrant status for purposes of applying to become an LPR.  But the statute does not constructively "admit" a TPS recipient—that is, "consider[ ]" him as having entered the country "after inspection and authorization."  § 1254a(f)(4); § 1101(a)(13)(A).  And because a grant of TPS does not come with a ticket of admission, it does not eliminate the disqualifying effect of an unlawful entry.

*Id.* at 415-16 (emphasis added).

Based on *Sanchez*, the Court concludes that the filing of an application for asylum is not

"seeking admission"; rather, it is seeking a "lawful status."  As the Tenth Circuit elaborated:

> "[A]dmitted" and "admission" are defined as "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).  This definition "is limited and does not encompass a post-entry adjustment of status," because it "refers expressly to *entry into* the United States, denoting by its plain terms passage into the country from abroad at a port of entry."  *Negrete-Ramirez* [*v. Holder*], 741 F.3d [1047,] 1051 [(9th Cir. 2014)]; *see Papazoglou* [*v. Holder*], 725 F.3d [790,] 793 [(7th Cir. 2013)]

("That provision therefore encompasses the action of an entry into the United States, accompanied by an inspection or authorization."); *Bracamontes* [*v. Holder*], 675 F.3d [380,] 385 [(4th Cir. 2012)] ("Clearly, neither term includes an adjustment of status; instead, both contemplate a physical crossing of the border following the sanction and approval of United States authorities."); *Martinez* [*v. Mukasey*], 519 F.3d [532,] 544 [(5th Cir. 2008)] (recognizing that "'admission' is the lawful entry of an alien after inspection, something quite different ... from post-entry adjustment of status"). Under the definition, [Petitioner] was not "admitted" when he became [a lawful permanent resident] after post-entry adjustment of status, because he did not enter the United States when he adjusted to that status.

*Medina-Rosales v. Holder*, 778 F.3d 1140, 1144-45 (10th Cir. 2015) (italics emphasis in original);

*see also Matter of V-X-*, 26 I. & N. Dec. 147, 147 (BIA 2013) ("A grant of asylum is not an 'admission' to the United States under [S]ection 101(a)(13)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(13)(A) (2006)."). Requesting asylum is thus a request for an adjustment of status, not a request for admission. Because "seeking admission" requires actively requesting admission, the filing of an application for asylum does not amount to "seeking admission" within the meaning of § 1225(b)(2)(A).

The Court's conclusion that admission is distinct from a grant of status is further supported by the government's careful practice of distinguishing a "grant" of asylum from "admission" as a refugee. For example, in defining "United States work," 8 U.S.C. § 1182(E)(ii) separately refers to a noncitizen who "is admitted as a refugee under section 1157" and one who "is granted asylum under section 1158 . . . ." Additionally, multiple government forms reflect this distinction by using the terms "admission" or "admitted as" to refer to refugees who enter the U.S. after receiving such status from abroad, and the terms "granted" or "grant of" when referring to asylees who obtain such relief from within the country. *See, e.g.*, Form I-485 (Application to Register Permanent Residence or Adjust Status); Form I-131 (Application for Travel Documents, Parole Documents, and Arrival/Departure Records); Form I-730 (Refugee/Asylee Relative Petition).

28

Lastly, seeking status cannot be so broadly read to mean seeking admission.  Courts often consider whether a particular interpretation of ambiguous language will have sweeping or unusual results, and such a reading would do just that.  *See Marinello v. United States*, 584 U.S. 1, 10 (2018); *Dubin v. United States*, 599 U.S. 110, 114 (2023); *see also Dekovic v. Rubio*, 169 F.4th 1002, 1015-16 (10th Cir. 2026) (finding it anomalous that provision as interpreted by the Government would penalize minor children of a parent who became a naturalized U.S. citizen).  Here, interpreting "seeking admission" to be so broad as to include any effort to obtain legal status (which, as stated, can be distinct from admission, as it is here regarding asylum status) would lead to anomalous results.  Such an interpretation means that a person who attempts to obtain authorized status through the appropriate legal channels risks a period of mandatory detention, while a person who does not disclose their undocumented status or attempt to rectify it may be released on bond.  No discernable heightened security risk applies to a person who self-discloses to the government in an attempt to comply with the law compared to a person who does not.  Further, this disparate treatment incentivizes undocumented noncitizens not to seek lawful status, which undermines the point of Congress creating such opportunities.

### C. <u>Failure to Properly Rescind Petitioner's Parole Violates Procedural Due Process</u>

Count II of the Petition asserts a procedural due process claim under the Fifth Amendment.  Doc. 4 at 25 ¶¶ 83-87.  Having found that Petitioner is not subject to mandatory detention under 8 U.S.C. § 1225(b), the Court must determine whether Petitioner's continued detention is proper under 8 U.S.C. § 1226.  Respondents argue that even should § 1226 apply, Petitioner's release is unwarranted because "the IJ made alternative fact findings that Petitioner was a flight risk due to traditional bond factors."  Doc. 11 at 15.  Respondents further contend, then, that "8 U.S.C. § 1226(e) strips the Court of jurisdiction . . . ."  *Id.*

8 U.S.C. § 1226(e) prohibits judicial review of the "[Secretary of Homeland Security]'s discretionary judgment regarding the application of" Section 1226.  Thus, "[n]o court may set aside any action or decision by the [Secretary of Homeland Security] under this section regarding the detention of any alien or the revocation or denial of bond or parole."  8 U.S.C. § 1226(e). However, as discussed next, no such decision was properly effectuated to revoke Petitioner's parole.  If anything, the Court's recommendation would simply restore Petitioner to his rightful pre-detention position and thus restore the ability of the Secretary of Homeland Security or other authorized officials to act pursuant to this discretionary power granted by Congress.  *See* 8 U.S.C. § 1226(b) ("The [Secretary of Homeland Security] *at any time may revoke a bond or parole authorized under subsection (a)*, rearrest the alien under the original warrant, and detain the alien.") (emphasis added).

Even assuming that Petitioner is only entitled to the process afforded by Congress, *see Knauff*, 338 U.S. at 544 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."), Congress authorized noncitizens in Petitioner's situation to be afforded the proper revocation procedure pursuant to the governing statutes and regulations.

Section 1226(a) authorizes the Secretary of Homeland Security—acting through immigration officers authorized to issue a warrant of arrest, *see* 8 C.F.R. § 236.1(c)(8)—to release a noncitizen on bond (of at least $1,500) or conditional parole pending the completion of removal proceedings, upon a determination that the noncitizen does not pose a danger to the community and is not a flight risk.  *See* 8 U.S.C. § 1226(a)(1)-(2); 8 C.F.R. § 236.1(c)(8).  That release, however, is not irrevocable.  The Secretary of Homeland Security and the immigration officials listed in 8 C.F.R. § 236.1(c)(9) have broad discretion to revoke such bond or parole "at

30

any time . . . ."  With that discretion comes responsibility.  After an authorized official exercises discretion to revoke the bond or conditional parole granted under 8 U.S.C. § 1226(a), the noncitizen is to be rearrested under the original warrant.  *See* 8 U.S.C. § 1226(b) ("The [Secretary of Homeland Security] at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.").

Here, no evidence in the record indicates that any such official chose to exercise their discretion to revoke Petitioner's OREC (Doc. 4-1).  *See* Doc. 4 at 3 ¶¶ 7-8; *id.* at 24 ¶ 79.  That alone is sufficient to find that proper procedure was not followed in effectuating Petitioner's arrest.  Moreover, the record clearly shows that Petitioner was arrested without a warrant, rather than pursuant to his original warrant of arrest.  *Id.*  Consequently, Respondents' re-detention of Petitioner violates both his statutory rights under the INA and his procedural due process rights.  The Court thus recommends that the Petition be granted as to Counts I and III.

The proper remedy here is immediate release.  A bond hearing, which Respondents alternatively argue is more appropriate than release, Doc. 11 at 15, would not adequately address Respondents' improper re-detention of Petitioner.  *See, e.g.*, *E.A.T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1324 (W.D. Wash. 2025) ("[A] post-deprivation hearing cannot serve as an adequate procedural safeguard because it is after the fact and cannot prevent an erroneous deprivation of liberty.").

However, the Court notes that Petitioner requests that the Court enjoin and restrain Respondents "from re-detaining Petitioner unless the government demonstrates by clear and convincing evidence at a pre-deprivation bond hearing before a neutral decisionmaker that a Petitioner is a flight risk or danger to the community, such that his physical detention is legally justified[.]"  Doc. 4 at 27.  Given the present relief, it is speculative that Petitioner will be re-

31

detained.  Therefore, such relief should be denied.  Notwithstanding the premature nature of such relief, the Court finds that a remedy challenging the burden at a bond hearing is outside the scope of the writ of habeas corpus "unless the bond hearing's existing structure is so weighed against the alien that the alien has no chance to be released on bond." *Castillo v. Andra-Ybarra*, No. CIV 25-1074, 2026 WL 370497, at *42 (D.N.M. Feb. 10, 2026) (Browning, J.).  Because a § 1226(a) bond hearing requires only that the alien prove that he is not a flight risk or danger to the community, the current structure does not deny an alien a meaningful chance at success at achieving release.  *Id.*  The Court thus recommends that the presiding judge deny Petitioner's request that Respondents carry the burden at the bond hearing and instead order that the bond hearing comply with § 1226 and its implementing regulations.  *See id.*

### D.  <u>**Petitioner's Substantive Due Process Claim is Moot**</u>

Petitioner argues that "Respondents' decision to re-detain Petitioner under § 1225(b)(2) after electing to process him under § 1226(a) constitutes 'deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice.'"  Doc. 4 at 25 ¶ 85 (quoting *Hernandez*, 734 F.3d at 1261).  He further contends that because there is no evidence he presents a danger or flight risk, the government has no interest in his continued detention.  *See* Doc. 4 at 25 ¶ 86.

Because the undersigned recommends the Court grant habeas relief on Counts I and III and order Petitioner's immediate release, Petitioner will no longer be subjected to prolonged detention.  Consequently, the Court recommends denying Petitioner's substantive due process claim in Count II as moot.  The Court recommends that such denial be with prejudice, because in light of the relief, any future detention will be separate from the present detention.  *Contra Singh*, 2026 WL 146005, at *39 (Browning, J.) (ordering relief in the form of a bond hearing rather than

immediate relief and denying petitioner's substantive due process claim without prejudice to give

"him the opportunity to refile should his detention extend to a length of time sufficient to cross

over to punishment and violate his substantive due process rights.").

### E. Attorney's Fees

The Petition includes a one-sentence request for "attorney's fees and costs under the

Equal Access to Justice Act . . . and on any other basis justified under law . . . ."  Doc. 4 at 28.

The Equal Access to Justice Act ("EAJA") authorizes an award of fees to a prevailing party in a

civil action against the U.S. unless the government's position was substantially justified or

special circumstances would make an award unjust.  28 U.S.C. § 2412(d)(1)(A).  The Tenth

Circuit has confirmed that the EAJA applies to habeas actions challenging immigration

detention.  *See Daley v. Ceja*, 158 F.4th 1152, 1166 (10th Cir. 2025).

The Court first concludes that Petitioner is the "prevailing party" in this case, in

accordance with its conclusions that Petitioner's present detention is not proper under either §

1225(b)(2) or § 1226.

Nevertheless, before allowing Petitioner to file a motion for attorney's fees under the

EAJA, the Court must determine whether the government's position was substantially justified.

The test for substantial justification in the Tenth Circuit is "one of reasonableness in law and

fact."  *Hackett v. Barnhart*, 475 F.3d 1166, 1172 (10th Cir. 2007) (quoting *Gilbert v. Shalala*, 45

F.3d 1391, 1394 (10th Cir. 1995)).  "Thus, the government's position must be 'justified to a

degree that could satisfy a reasonable person.'"  *Id.* (quoting *Pierce v. Underwood*, 487 U.S. 552,

565 (1988)).  "The government's 'position can be justified even though it is not correct.'"  *Id.*

(quoting *Pierce*, 487 U.S. at 565).  Further, the government's position is substantially justified if

there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.  *See Pierce*, 487 U.S. at 565.

Based on the above test, the Court concludes that Respondents' position that the government may properly detain Petitioner under § 1225(b)(2) is substantially justified such that an award of EAJA fees is not appropriate.  Although the Court determines that Respondents' position on the application of § 1225(b)(2) is incorrect, that alone is insufficient to conclude that the position is not substantially justified.  When an area of law is "unclear or in flux, it is more likely that the government's position will be substantially justified."  *Martinez v. Sec'y of Health & Human Servs.*, 815 F.2d 1381, 1383 (10th Cir. 1987).  Indeed, the law currently distinguishing § 1225 and § 1226 is in flux.  Courts across the country currently face this issue and have reached contradicting results, with several district courts adopting the position that the government takes.  *See, e.g.*, *Vargas Lopez v. Trump*, 802 F. Supp. 3d 1131 (D. Neb. 2025); *Chavez v. Noem*, 801 F. Supp. 3d 1133 (S.D. Cal. 2025); *Mejia Olalde v. Noem*, No. 25-cv-00168, 2025 WL 3131942, at *3 (E.D. Mo. Nov. 10, 2025).  Three Courts of Appeals have considered the interpretation of § 1225, and they have reached contradicting conclusions, with the Seventh Circuit aligning with the arguments set forth herein in *Castañon-Nava*, and the Fifth and Eighth Circuit embracing the government's position in *Buenrostro-Mendez* and *Avila*, respectively.  *Compare Castañon-Nava*, 161 F.4th 1048, *with Buenrostro-Mendez*, 166 F.4th 494, *and Avila*, 2026 WL 819258.

Therefore, the Court is unable to say that a position is substantially unjustified, which requires only reasonableness in law and in fact, when a Court of Appeals, the Fifth Circuit, as well as district courts across the country, embrace that same position.  The Court is reluctant to deny the award of fees to a prevailing party; however, Congress, in waiving the government's

34

sovereign immunity to allow the recovery of fees under the EAJA, limits this waiver, and the Court must respect that limitation.  The Court concludes that the government's position in arguing that § 1225 rather than § 1226 regulates Petitioner's detention is substantially justified, and, accordingly, the Court does not allow Petitioner to file a motion under the EAJA for fees.

## V.  RECOMMENDATIONS

Based on the foregoing, the undersigned recommends that the Amended Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Doc. 4) be **GRANTED IN PART and DENIED IN PART** as follows:

A.  The Amended Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Doc. 4) should be **GRANTED** as to Counts I and III (for violations of the Immigration and Nationality Act and procedural due process).

B.  The Amended Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Doc. 4) should be **DENIED WITH PREJUDICE** as to Count II (for violation of substantive due process).

C.  The following remedies requested in the petition should be **GRANTED**:

1.  Accept jurisdiction over this action;

2.  Declare that Petitioner's detention is not governed by 8 U.S.C. § 1225(b) and Respondents failed to properly revoke his conditional parole to warrant detention under 8 U.S.C. § 1226(b), in violation of the Immigration and Nationality Act and procedural due process;

3.  Issue a writ of habeas corpus ordering the immediate release of Petitioner; and

4.  Order Respondents to file a status report confirming compliance with the Court's order within seven days of its issuance.

D. The following remedies requested in the Amended Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Doc. 4) should be **DENIED**:

1. The alternative request for Respondents to provide Petitioner with a custody redetermination hearing under 8 U.S.C. § 1226(a) and the relevant regulations, where the government must demonstrate by clear and convincing evidence before a neutral decisionmaker that Petitioner is a flight risk or danger to the community, such that his physical detention is legally justified;

2. The request to enjoin and restrain Respondents from re-detaining Petitioner unless the government demonstrates by clear and convincing evidence at a pre-deprivation bond hearing before a neutral decisionmaker that Petitioner is a flight risk or danger to the community, such that his physical detention is legally justified; and

3. The request to award Petitioner attorney's fees and costs under the Equal Access to Justice Act.

In light of the foregoing recommendations, the undersigned further recommends **DENYING AS MOOT** Petitioner's *Motion for Immediate Release Pending Resolution of Habeas Petition* (Doc. 12).

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**